Good afternoon, Illinois Public Court, 1st District Court is now in session. The First Division, the Honorable Justice Michael Hyman presiding, case number 2-0-0-7-3-5, Daniel Rivera v. Allstate Insurance Company. Good afternoon. I'm Justice Michael Hyman. With me is Justice Dan Pierce and Justice Mary Ellen Coghlan. Will the attorneys please introduce yourselves? Your Honor, my name is Robert Sweeney and I represent the appellants. Good afternoon. My name is Rex Heineke. I represent Allstate, the defendant. Okay, each side will have 20 minutes. Mr. Sweeney, you can reserve some time for rebuttal. We will treat this as if we were in court. We will interrupt you and if you would finish your point and then please turn to the question that was asked. Mr. Sweeney, about how many minutes do you want for rebuttal? If I could reserve five minutes, Your Honor. That's fine. And we're not real strict on the clock, but we still need repetition. So, Mr. Sweeney, you may proceed. Thank you. May it please the court, my name is Robert Sweeney and I represent the plaintiffs appellants in this case. The trial court erred in granting dismiss in this case for two primary reasons. First, the doctrine of collateral estoppel does not apply as the jurisdictional analysis that was engaged in by the Seventh Circuit is not identical to the issues that were faced by the trial court in ruling on the motion to dismiss the state law defamation and false law. Second, the trial court erred with respect to the claim for defamation per se in granting the 615 motion to dismiss as the trial court incorrectly held that in order for a plaintiff to prevail on a per se claim to defamatory statement, identify the plaintiff by name. That is an incorrect statement of Illinois law and it has been since 2001 when the Supreme Court of Illinois announced the decision in Bryson versus News America. If we could turn to the collateral estoppel issue first, there are a host of reasons why this court or one could know why the identity issues between the Fair Credit Reporting Act analysis done by the Seventh Circuit and the defamation analysis done by the trial court are not identical. The first would be obviously that the Fair Credit Reporting Act and defamation claims are different. This isn't a situation where a claim was brought one place and then a decision was made and someone tried to bring it again. Beyond that, this court could look to the elements of the claim and see that they are patently different. A Fair Credit Reporting Act claim has five elements. An employer must engage a third party to do an investigation of employee misconduct. The third party must do the investigation and create a report. Let's look at what the defendant says. It says the Seventh Circuit held that plaintiffs failed to provide to prove injury that you claimed because you could not name any employer that refused to hire them because of the statements in the 10k or the Griffin memo. If that was part of the holding, would it then include a decision on that question? The answer is that the issues are not identical. So under a Fair Credit Reporting Act analysis, which the Seventh Circuit did, there is no to have anything. You have to prove those five elements. One, a report was commissioned. Two, a report was created. But in that sentence, they're not talking about the Fair Credit Act. They're talking about the 10k and the Griffin claim. So the defamation, you're late. Yes, Your Honor. There was about a very lengthy exposition by the Seventh Circuit with respect to whether or not subsection Y2 of FCRA permits a plaintiff to have standing under or to pursue a case in federal court. And the Seventh Circuit did an exhaustive analysis and came away with the conclusion that if someone brings that FCRA claim and brings those five elements, the sole relief they can get is a liquidated penalty of $100 to $1,000. There is no requirement that you prove damage. The statement that all states has sort of hitched its wagon to here, and I think the one the court is talking about, is the quote that comes at the end of that very long exposition where the Seventh Circuit says, as a matter of law, that a subsection Y2 claim in federal court does not convey standing, and therefore the federal court does not have jurisdiction. There was a statement where they said, the Seventh Circuit said, quote, we note moreover that they failed to identify any prospective employer that refused to hire them based on the 10k or the Griffin memo. So they have not established that they suffered a concrete informational injury. That statement is not a necessary statement for a jurisdictional analysis. The Seventh Circuit and this court specifically announced in Lehman versus Continental Healthcare, once a court expresses the view that it lacks jurisdiction, the court no longer has the power on any other matter and any additional finding on the merits carries no res judicata or collateral estoppel effect. The fact that the Seventh Circuit made that observation at the end of its jurisdictional analysis where it said there is no jurisdiction under FCRA subsection Y2, it's not something that this court could use or any court should use for collateral estoppel purposes, and I would point out that to the extent that the Seventh Circuit did make that observation, there was no factual analysis done by the Seventh Circuit, and in fact, all states agreed with the Seventh Circuit that that no factual analysis should take place. They said the question of jurisdiction is a legal question. In a colloquy with Judge Sykes who wrote the opinion in Rivera, counsel here today argued that he said it's a legal argument. That's in your brief we've read. It is, it is. Well, I want to highlight it because what it emphasizes is that under Lehman, it wasn't necessary for the Seventh Circuit to make that observation. In fact, under FCRA, if you're looking at a FCRA analysis, there's no reason whatsoever to look at the 10K or the Greffin Memorandum or damage. If you're looking purely at FCRA to determine whether or not there's a concrete informational injury, you don't have to look at the 10K or the Greffin Memo. In fact, you shouldn't. You should simply look at were the five elements proven, and if they were, does that informational injury which Subsection Y2 provides to consumers, was that informational injury sufficient to justify a federal jurisdiction? And until May 16th of 2016, until the Spokio decision was decided, it was. But after the Spokio decision, 17 days or so before our trial in this case, it was a concrete informational injury that was required. And the Seventh Circuit explicitly said in its opinion under Subsection Y2, you cannot have a substantive defense interest under Subsection Y2. Mr. Sweeney in his closing argument might have thought he was entitled to it, but he isn't. They said that Subsection Y2 doesn't protect a substantive defense interest. This is at page 617 of the opinion. At most, it serves a minimal notice functions, and the plaintiffs cannot explain how the modest post hoc summary required by Subsection Y2, again, a brief oral summary, would permit a concrete informational injury. The Seventh Circuit closed the door to FCRA claims in federal court under Subsection Y2 in the Rivera opinion. There is no factual determination, and certainly not one with respect to a 10-K or a Griffin memo. That statement that all statements lock onto, we would point out that this court in hexacomb versus corrugated system said specifically, if there is uncertainty on the point, then collateral estoppel cannot be applied. There must be clarity and certainty that what was determined in the prior judgment is the same issue that was determined here. One must ask yourself, if the court was doing a jurisdictional analysis, then why would it look at the 10-K or the Griffin memorandum? And the answer is one would be uncertain. Certainly, there's a question if you're looking at a jurisdictional question. Beyond that, I think we've also got the issue that these two facts and circumstances that gave rise to this situation, these are completely separate. The temporal relationship in terms of the timing of when FCRA action accrued and when the defamation action accrued, separate. September 2009 to December 2009 is when the plaintiffs were told they were being terminated for cause, and when they requested their summary, they didn't receive it. And then in February of 2010 is when the defamation occurred and the 10-K and the Griffin memorandum were published. There are no facts or circumstances that underlie either claim that one could use to the other. And by way of example, one could simply look at if one was to pursue the FCRA claim in federal court and not pursue the defamation claim. If a plaintiff attempted to start to try to bring in employers to say, I didn't get a job because I didn't receive an oral summary that was nondescript, would the trial court even allow that testimony since it's not an element of the claim? Or conversely, if you tried to bring a defamation claim and started arguing about whether or not you received an oral summary of the reason you were terminated in a report from a third party, would that court allow that testimony? And the answer is clearly no. So there's no overlap. There is no identity of issues involved between the Seventh Circuit's analysis and the very beyond that, as this court has recognized in a host of circumstances, it must be necessary. It must be necessary. The determination by the prior court must be necessary for the determination of the subsequent court. And there is no way that if the Seventh Circuit decided that FCRA subsection Y2 does not convert, I'm sorry, convey federal court standing, that it should be or needs to be looking at whether or not the plaintiffs provided evidence of employers that were impacted by the 10-K or Griffin-Moran. It's simply not a necessary finding. And this court's exposition in Hexacombe and also our Supreme Court's position in NOAC versus St. Rita, said the issue decided in the prior adjudication must be identical with the one presented in the suit in question. Absolutely, they're not. This court said in Hexacombe that it is all state, or it would in this case, the party who's seeking preclusion. It would be their burden of showing the clarity and certainty that was determined by the prior judgment is the same that would be determined in this judgment, and that that burden of proof is a heavy one. All state can't carry that. And it's not necessarily their fault. It's just that what they've argued here is something different than they argued in the appellate court. And we've got a rather confusing statement in the Seventh Circuit's opinion about at the end of their analysis of jurisdiction, where they begin to talk about the 10-K and Griffin memo. We will point out that the Seventh Circuit said at the outset of their opinion, their analysis begins and ends with the jurisdictional question. It did not turn on the 10-K or the Griffin memo at all. They also said it was regrettable at the end of their opinion that that much time had been invested in a pursuit of these claims, only to have to find that there was no standing. The Seventh Circuit didn't say that it was foreclosing the opportunity for plaintiffs to pursue the case in state court. They said, you're not going to be able to pursue it here. You're going to have to go somewhere else. In that respect, we believe that the decision by the trial court was in error, in that the issues were not identical. And certainly the decision made by or the observation- Let me ask you about a different issue. You spent all your time on that issue. With regard to the first say, which is one of the two issues you really wanted to discuss, I don't understand how Bryson helps you. In Bryson, the name of the plaintiff is Bryson. There is nothing here that identifies the plaintiff. The Supreme Court specifically said, the quote is that in cases where the plaintiff is not there, it must be observable or reasonable that some other party, other than the plaintiff or defendant, would know that the statement was about them. Right. And there's nothing there. As you point out, there is four divisions and there were 25 employees. It's not mentioned which division, not mentioned which employees at all. It says that the affected portfolios were transferred to a third party. That's right. We're talking about hundreds of millions of dollars. We're talking about a very limited- But what we're talking about are individuals. Who are these individuals? There is nothing like Bryson where the person's name was used. You're relying on Bryson. What we're relying on is the language of Bryson where they say, and there are subsequent opinions. Also, you can look at, there's a host of them, we would say Jane versus Butler School District was also instructive on that point. You don't need to identify the plaintiff by name. If that was the rule, you could simply say all sorts of terrible things about someone, but not put their name in there. Well, then that's not what Bryson recognizes. Bryson says that if someone other than the state would be about this person, and you can allege that, which we have in our complaint, which we offered evidence of at the trial in the district court and federal court. If you offer that type of evidence, which we did, namely, there's a host of them, that we were walked out of the building on a perp walk, that our emails were shut off when no one else's was, that we weren't given severance when other people were, that we had people calling us on our cell phones and private emails saying, what's going on? Why are you not there? Then ultimately everyone found out in February 10K, the affected portfolios were moved to Golden Sacks. We're talking about hundreds of millions of dollars. There's a very limited pool of people who manage those types of portfolios. 25 people, is that right? Or is there more than 25? There were 25 people in the equity division. Okay. There were only four people that were walked out of the building whose emails were shut off, whose phones were shut off, who weren't allowed access to the building, who had to call their loading dock. But still, in Bryson, we have, I mean, just because the court said that this whole case was a very small group, everybody knew who it was according to the decision. That too can be distinguished from the situation. I don't think so, your honor. I think that would be a question of fact, ultimately. I think what you would have there is you've got a host of everyone in this community would know that we're talking about these people. And in fact, at trial, witnesses were brought out who said, we know it was about them. We believe it had to be about them. And who else could it have been? All state throughout this entire time has never suggested who else it could be because they know. You just said at trial, all we have to go on is a complaint, right? The complaint says that we've alleged in multiple paragraphs of the complaint that people in this very small community knew who was involved or who was implicated by that statement. They knew that Daniel Rivera was the head of equities. Equities were transferred. The equity division was transferred. All the money was transferred. The growth team, all the money was transferred to Goldman Sachs. Hundreds, if I'm not sure, I don't want to overstate it, billions. I know there was billions of dollars in it. But we're talking about a very walking up and down the hallways all the time, trying to contact these people saying, please buy stock in my company, please buy stock in this, please invest in this. And then all of a sudden they're gone and no one else is gone. Well, that's a fact question, we would say. And Bryson says, yes. They got rid of three of the four divisions, right? They did. Okay. Well, that's a lot of people. So, and you're saying, well, no, they would have known about these four. They were all allowed to stay on. All those people were allowed to stay on. So, the announcement was made way before that. All these people were allowed to stay on except for the four who were walked out. Those people were not. Those people were AWOL when phone calls came in and anybody came to do anything related to the growth team. It was the growth team. It was the four people, the three people on the growth team and Daniel that were implicated. Those were the four people that were, it was suggested, engaged in this behavior. And those were the affected portfolio. We would say ultimately that's a fact question. We've got a substantial number of facts that we laid out that would point to the plaintiffs in this case. And we believe that should survive. Certainly Bryson does not stand for this. I mean, there is no Illinois case that stands for the proposition that you have to be identified by name. Bryson flat out says you don't. So, the position that all states taken is incorrect. The question of whether it's 25 or four, we would say that in our case, we've got sufficient facts that would distinguish us from any other group setting that the cases where there's a group setting. These four are unique. These four were identifiable. And to the extent we've alleged that they're identifiable by persons other than the plaintiffs or defendants, that should suffice for a 2615. Okay. Thank you. Justices, do you have any further questions? No, sir. Okay. I have none. All right. Thank you. And you have five minutes for rebuttal. Thank you, Your Honor. You may proceed. Thank you, Your Honor. As I said, my name is Rex Heinke and I represent all state. Let me turn first to the per quote question since that's where opposing counsel started. Opposing counsel says there's no identity of issues here. We submit that he is mistaken about that. The identity of issues is that whether there was damage. The plaintiffs said in the Seventh Circuit, the federal courts have no jurisdiction under the Supreme Court's decision in Spokio. Spokio said that to have Article III standing in federal court, you have to have injury. So, the plaintiffs said after they lost the first round in the Seventh Circuit, nope, you can't decide the defamation claim. You've said, FICRA, there's no injury. So, you got to dismiss this in the Seventh Circuit agreed. But in doing that, the Seventh Circuit determined whether or not there was any damage to the plaintiffs. Well, but doing that was outside, it was pure dictum because if they have no jurisdiction, no jurisdiction, then why would they, you know, the case, they said, you know, maybe it shouldn't have been in the federal court, you know, and all this time has been wasted. But they didn't say that you couldn't proceed, they couldn't proceed in state court. So, why would we read it broadly when they say they have no jurisdiction over the federal claim? And the federal claim, as counsel points out, is substantially different than the common law claims. Well, the reason is this. What plaintiffs claimed under FICRA was they were entitled to a summary of the reasons that they were terminated. The Seventh Circuit said, well, that summary would only have to be oral and it would only have to be after the fact, that is, after the plaintiffs were terminated. And then, and I think this is the really the key language in the Seventh Circuit's decision, the Seventh Circuit says, this is on page 617, the plaintiffs insist that all states failure to comply with subsection Y2 left them hampered in defending themselves before all states and before potential employers. And then the Seventh Circuit goes on to say, the plaintiffs have not explained how the modest POCOT summary required by subsection Y could possibly have been formed against a defense against all state after the fact, that is, even if they had the summary, all state had already terminated them, so it wouldn't have done them any good. And then, this is key to the jurisdictional holding, the court also said, we note moreover that they failed to identify any prospective employer that refused to hire them based on the 10-K or the Griffin memo. So they've not established that they suffered a concrete informational injury, nor have they identified any tangible or intangible harm as a result of all states failure to comply. That was essential to the court's determination, the Seventh Circuit's determination of whether it had jurisdiction, and it had jurisdiction to determine its own jurisdiction and to determine things that were related to its jurisdiction. It's just that on the federal claim, that state claim or the common law claims all have to do with acts that occurred two months later, and the damages are quite different. The damages under the federal claim are a thousand dollars, that's an incident, the damage or whatever it is, it's different than what it is under the common law claim. So, and the fact that they talk about that in the opinion does not mean that it's not dicta. I mean, that's what his argument, Mr. Smitty's argument was, it's dicta. Yeah, what do you say to that? I say that the determination that there was no injury as to any prospective employers and the lack of a summary given to the plaintiffs, that was key to the decision, because the plaintiffs said, there are two ways we got hurt here. First way, we didn't get a summary, and so we couldn't talk to all state and use it to exonerate ourselves with Allstate. They also said the other way that we were hurt by not getting a summary was that we couldn't use it with prospective employers. And the Seventh Circuit said, well, that doesn't work with Allstate because they only had to give it to you after you've been terminated. And it doesn't work as to prospective employers because you couldn't identify anybody you could have used it with. And therefore, you fail to establish any injury. And under Spokio, there's no Article III standing. And so the determination that they did not identify any employers, prospective employers, who they could use the summary with was key to the determination that there was no Article III standing. You also mentioned, Your Honor, that the court didn't say, the Seventh Circuit didn't say they couldn't go to state court. That's true. But of course, it wouldn't have been up to the Seventh Circuit to determine whether there was collateral estoppel. That would have been beyond any determination of its jurisdiction. It simply said, we don't have jurisdiction. Parties can go litigate in state court. And whatever happens in state court is what happens. So that, I submit, is immaterial. What is material is, and it's not dicta, is the holding that they couldn't identify any employers. And therefore, they couldn't show one of the two types of injury they claimed. And without the showing of injury, they failed to prevail in the Seventh Circuit. And I submit, it failed to prevail here. Because the issue, it's the same issue. Did they identify any prospective employers who didn't hire them because of the memos? And the answer is, they never did after eight years of litigation. Let me turn to the per se issue, if I may. Although I'm happy to answer any other questions the court might have about per quo. The per se issue, the plaintiffs say they prevail under Bryson. But Bryson is a case that I submit supports us. In Bryson, the court, the Supreme Court, Illinois Supreme Court, found that first, the plaintiff's last name was used in the article. And second, the court found that there were 25 similarities in the article between the person in the article and the plaintiff. And on that basis- know what Bryson says. But Mr. Sweeney is arguing that in addition to not naming, that the plaintiff was not identified by name, which we all agree is true. But what about, how do you respond to his argument that they have all these other facts in the complaint about being let out of the building and, you know, the number of things that he articulated? What's your response to that? Is that necessary? How does that affect your analysis? Well, Your Honor- Everybody knew, and everybody in this small little community knew who these people were by virtue of the way this all went down. And Your Honor, in a per se case, and that's what we're talking about here, not per quo, but on his per se argument, it has to be on the face of the articles. Here, not the article, the Griffin Memo, and the 10-K. That's what a per se claim is. It's a claim that when you read the allegedly defamatory statements, on the face of those statements, the plaintiff is identified. And the plaintiffs were not identified here on the face of the complaint. What he is arguing is his per quo claim. He's saying, I could go to the jury, and I can prove, not on the face of the articles that say article 10-K and the Griffin Memo. He's not saying he can prove it based on what they say. He's saying, I can introduce extrinsic facts that will prove my claim. That's a per quo claim. It is not a per se claim. A per se claim is, what does the defamatory statement say? Does it say who the plaintiff is? Does it use the plaintiff's name? Bryson used 25 things that were alleged similarities between the plaintiff and the person identified in the article. So you don't need the name, but you need some other identifying factors. Yes, you need enough that people would look at it as in Bryson. Okay, well, it was the last name, but maybe there are other Brysons. But there was enough there with the name and the 25 alleged similarities to make out a per se claim. On the face of the article, those similarities and the name were there. That does not exist here. If you read the 10-K and you read the Griffin Memo, there is nothing there that identifies them. So you concede that they have made a per quod claim? I think you mean on whether it's about them? Yes. No, I think that's a triable issue as to whether the fact... If we disagree with your collateral and then at least with that claim that they've alleged enough to go forward. Well, I don't think they've alleged enough to go forward on the per quod claim because even if the court was to find that the Seventh Circuit's decision was not binding here, they still have not alleged that there were specific employers who did not employ them, whatever the Seventh Circuit said. They have still completely failed to allege that. We've had eight years of litigation, a jury trial, and they still cannot identify a single prospective employer who refused to employ them because of the 10-K and the Griffin Memo. They must do that. Whatever the Seventh Circuit said, they must do that, and they have completely and utterly failed to do that for eight years. What would be unfair is for us to go forward again and have to litigate that all over. They have failed to prove that. So if we're wrong about the Seventh Circuit... They don't have to prove it. You're saying that they have failed to plead. Well, right, although they also had a chance to prove it. But yes, they failed to plead. We're not going to take it. Right, they failed to plead it. My only point is the reason they failed to plead it is because they can't. But in any event, they failed to plead it. So either way you look at it, either we win on collateral estoppel because the issue has already been determined by the Seventh Circuit, or alternatively, in any event, they have failed to allege that they could identify any prospective employers. Without that, they have no per quote claim. And on the per se claim, they cannot point to anything in the article. I'm sorry, I keep saying articles in the Griffin memo in the 10k that shows that this is about them. And therefore, their per se claim fails. If the court has other questions, I'd be happy to attempt to answer them. Any further questions? Thank you very much. Thank you. Thank you, Justice Simon. A few points. Council referenced the Seventh Circuit's opinion on page 617. However, he left off the first sentence of that provision where he said that plaintiffs have not explained how the modest hoax hoc summary required by subsection Y could have informed a defense against all state after the fact. He left off the first sentence of that, which says subsection Y doesn't protect a substantive defense interest, meaning no plaintiff under subsection Y2 of FCRA can suggest that if they had a summary, they would have a substantive defense interest, which would constitute a concrete informational injury, which would open the doors to the federal courts under subsection Y2. That, the court closed the door on. If we don't have a substantive defense interest under subsection Y2, there is no concrete informational injury, there is no standing, there is no jurisdiction, and nothing else matters. That's a question of law that the with respect to the statement, Mr. Henke's, or counsel's, sorry, position with respect to Bryson, I think what we eventually got to was the fact that courts can look to other extraneous facts other than a person's name, whether it be 25 or 12 or 32, and decide does that sufficiently identify the other than the plaintiff and defendant recognized that statement was about them. Well, where would we go? You're saying we should go outside the complaint? No. Or, excuse me, I mean, be more specific. Go outside the statement. So in this case, the memo and the 10K. I'm saying for a per se case. Sorry. Yeah, go ahead. Yeah, for a per se case, you would look to whether or not individuals other than the plaintiff and defendant realized that that statement was about the plaintiff. But you're limited to the documents that issue for a per se claim, aren't you? Sure. You would be limited. What is it about those documents that anybody could identify anything from? So, for example, if you were to say that you stand up in front of a class and you take someone out of the room and then you come back later that day and say, well, some people were accused of cheating. They've been removed and we don't have to worry about that anymore. I want everybody to continue on with the test. Well, that person would have a very good argument that they were the ones that were implicated. Now, I'm not saying that's the perfect situation. My analogy might not be perfect here. But when you do say that there are enough extenuating circumstances that people in that community would know that that statement was about them, it does not need to name it. I mean, there's simply no other way. But you're talking per quad. Well, per se, despite what the court said with regard to this particular statement, you still look at the statement and the statement say some employees responsible. That could be up to 25 people for trading equity securities in certain portfolios. You know, again, it's very broad. And and then it goes on to say that the affected portfolios were transferred, removed. Right. And there were three portfolios, apparently, or more. No, no, no. The growth teams portfolios were moved. And then the obviously the plaintiffs were the ones that were subjected to all those different behaviors than everyone else in the group. So one could infer, figure out in that community that it was these four people that were involved. No, again, this is a very different. We're looking at the words that were. I think you're voting per se, trying to be about the same. Well, I think I think what what the Supreme Court and Bryson was dealing with was a situation where you've got one of the five enumerated reasons why it would be a per se claim. And then the question was, does it sufficiently identify the plaintiff? So we've got the normal one of the five reasons that would constitute a per se action. But does it identify the plaintiff? And then the question was, well, do you need to identify the plaintiff? And the Supreme Court flat out said, I mean, there's no way around it. That's the language they use. If someone other than the plaintiff and defendant would recognize repeating it, but that doesn't help you because in Bryson there, the statement over and over had specific facts that would relate to Bryson. And not only that, they used her name, but there were statements about her, about her specifically that people could take to identify here. There's no specific statement that allow you to identify these individuals that you represent. Isn't that a difference? We would say that the, if you look at Bryson, I don't think it requires that the information that would be analogous. It's as if you say, I know who this person is because I've seen the circumstances, even though they didn't say everything they did. I could have one statement that accused someone of adultery, let's say, but I don't name them. But I provide some information that everyone in that community would know. Oh, that was about them. That would be sufficient. It doesn't have to contain. But there isn't anything in these statements that does that. All it has to say is that they committed adultery. All the statement would have to say is that they committed adultery. No, no. And then it would have to provide some information that would lead you to believe that it was about the plaintiff. That's right. And there's no information here that leads you to believe in those statements. In the statements, you keep trying to, you can't you still look at the statement. Don't forget it's a per se case. Sure. The investigation that was done that started in 2009, everyone at Allstate would know about that investigation. It's not in the words. I'll stop. I would say that Allstate does say in the 10K, we went through this investigation. We hired outside agencies. Everyone at Allstate knows they had to go to a hotel and give statements to these outside lawyers. Everyone knows that. Then we go through in the 10K and they say, after that, we determined that people were using the system to game the system. And then they start showing people emails from our clients that say, okay, were you, you know, do you know anything about this? And then they fire us for cause. Then they perp walk us out of the building. Then they won't let us in the building. Everyone in that community knew. Everyone in that community knew. And it's sort of like the court in Tonka. You know, sure. It was limited to Northwest Community Hospital. It was limited to the statement about whether or not when someone clipped an artery or not, but it went beyond the hallway because everyone then was able to figure out who they were talking about. There's a question about damages more than anything. That one was, but the point is the same. It doesn't apply. I mean, again, it doesn't apply here. That's a different issue. Well, I appreciate your honor. And I think that what we're talking about is more a quantum of and I would suggest that at the pleading stage and at this stage, we would be entitled to at least the presumption that things looked at in the light most favorable to the plaintiffs and drawing all reasonable inferences there from that, that, that it should have gone our way. With that, I would like to briefly talk about the statement with respect to special damages that counsel brought up in his argument. Essentially, I would direct the court to Imperial apparel. I think that case really, it was a decision by this court where it flat out said that in a widely disseminated statement, we're not going to hold the party to an unreasonable standard of proof. If this court was to say that we did not allege special damages, this would be the first court to say that we didn't get an opportunity to replete. The trial court didn't base its decision on that. We believe that, that in this case, when all state itself would not give us an explanation as to why we were being terminated for them to come back then and say, well, you don't have anybody else who told you why you weren't hired when everyone knows that employers, sophisticated employers these days, don't tell people that, you know, I thought there was some character flaw in your background or some nice thank you note, wish you the best and you move on. That's all you get. That's the advice. That's what all state did, but they're trying to hold us to a different standard. But Mr. Sweeney, this is somewhat different than your more usual pleading 615 motion to dismiss where plaintiff files his complaint, defendant moves to dismiss because it doesn't state a action. You ask for time to replete and, you know, go forward. You've had eight years of litigation, I assume extensive in federal court to garner your case and your facts so that you could plead special damages for your per quad claim. And I don't see any special damage pleadings. This is not like something that popped up out of the blue, is it? No, it's not. But I would also point out that, you know, those eight years ended up in a $27.1 million verdict with a trial with a jury that said, yes, you did prove damages and a district court judge that agreed with that. Beyond that, what I would say is. So you then know that you now have to come back, you choose to come back to the state court and basically start all over again. But you don't plead special damages and you know special damages are an element of the cause of action. We believe that we have pled damages that at this stage, at the pleading stage would suffice. If this court was to decide that we haven't, then I think we would be entitled to an opportunity to plead them. And what I'm pointing out to the court is that contrary to Mr. Hankey's suggestion, this court has not required people to say you didn't get this customer, you didn't get this employee, you didn't get this job. There are circumstances where this court has said specifically in a period of apparel, we are not going to hold a plaintiff to a standard that would be unreasonable in bringing forth proof of special damages. In this case, the court, you know, in Tonka to Judge Hyman's point, yes, that was a damages case and yes, this court affirmed a decision where the plaintiff was entitled to get losses of 25 percent of their income. The same thing happened in Leishan. We think that case is directly on a per se claim. This court affirmed a 3.1 million dollar verdict because the plaintiff in that case brought forth an expert and showed loss of income for the years in question. Just take Imperial Apparel. There was an allegation that it could be quantifiable because you had what their sales were before and what their sales were afterwards. You have no allegations with regard to that. It's a very different case, but there was a basis provided to quantify what the damages were. There is nothing here to say there were damages or special damages. Well, I mean, it doesn't say that they even interviewed any place. I mean, it doesn't say they were turned down. It doesn't say anything. It says that they were not able to find. They don't even know. They didn't allegedly even look. It says they were not able to in multiple multiple allegations says they were not able to find employment. We would say that that's four people over the course of six years at the time. Now, it's more than that. But beyond that, in terms of special damages, all state, I mean, if we're going to get down in the weeds with that, all states agree. All states provided an expert in the trial court, in the district court that said, if we prove liability, because we can't consider that. I mean, well, I don't want you to hit. We can't consider what happened in the trial. No, I understand. But in terms of us doing you any good, I mean, we are I know, but in terms of us making an allegation entitled to replete, all state presented an expert at the trial court that said, if we prove liability on defamation, the damages were 11.1 to 11.3 million. That was their expert, not not our. So in terms of damages and whether or not they exist, if we prove liability, I think there are facts in this case to the extent we haven't laid them out in exacting detail in the complaint. We believe we'd be entitled to do that. I think at this stage we should pass the hurdle that that is necessary to get passed a motion to dismiss. Well, in your reply brief after all state raised the issue that you didn't sufficiently plead for quite claim, you just came back and said, yes, we did. You didn't ask for remand back to repeat. Did you? We believe that that that was not an issue that was decided by the trial court. That would be an issue that this court would have to decide to no vote. And we defended the complaint. But to the extent this court was to find that we did not elect special damages in the complaint, we would request an opportunity to repeat. We believe that that fits with the standard that a party should liberally be given the opportunity to do that. And in this case, this issue didn't come up until their brief. Well, again, this is eight years into the litigation. It is, but is it fair? Is it? Is it unfair for us to infer that after eight years, knowing what the elements of the claim are that you would have pled facts supporting an element of the claim? We believe we did. But to the extent this court wants more detail, we believe that detail can be provided. We weren't given that opportunity. And under most circumstances, you would. But you had that opportunity when you read, I mean, what this is referring to is all the things that happened beforehand. So you had a tremendous opportunity. That would be like saying you investigated your claim for eight years. You have all this information. Why didn't you include the information in your complaint? Because you did this substantial investigation. Look, nobody would rather have that verdict in place than me, except for maybe the plaintiffs. But the reality is it's not. And it's all moot. And it's out the window. The discovery we've got, the facts we've got, the extent they're marshaled the way that this court would think acceptable or that Mr. Heinke has pointed out is in error, we would ask for an opportunity to repeat that. And I think under just about any circumstance, that would be permitted. With that, I know I've used my time, unless there's any further questions. Any further questions? Thank you very much. I want to thank both sides for their brief and well-prepared arguments. We appreciate it. We'll take the case under advisement.